UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STEPHANIE CHAPPELL,                                  Case No. 08-CV-0851 (PJS/RLE)

        Plaintiff,

v.                                                   MEMORANDUM OPINION AND ORDER

BUTTERFIELD-ODIN SCHOOL
DISTRICT NO. 836,

        Defendant.

Thomas B. James, JAMES LAW OFFICE, for plaintiff.

Sarah E. Morris and Paul C. Peterson, LIND, JENSEN, SULLIVAN &
PETERSON, P.A., for defendant Butterfield-Odin School District No. 836.

Plaintiff Stephanie Chappell brings claims of discrimination, retaliation, and failure to

accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.,

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Minnesota Human Rights Act

("MHRA"), Minn. Stat. § 363A.01 et seq., against her former employer, Butterfield-Odin School

District No. 836 ("the District").[1]  This matter is before the Court on the District's motion for

---

[1]The claims in Chappell's complaint are numbered One through Five, Seven, and Eight;
Chappell inadvertently omitted a Count Six.

Chappell previously stipulated to the dismissal of her claims against the American
Federation of Teachers and the AFL-CIO, and she voluntarily withdrew her claims against Lisa
Shellum and Vonda Rinne.  Docket Nos. 74, 78 at 3.  The Court then dismissed Counts Three
through Five in their entirety.  Docket No. 78 at 11.  Chappell later stipulated to the dismissal of
her claims against Education Minnesota and the Butterfield-Odin Education Association.  Docket
No. 108.  Accordingly, Chappell's remaining claims are Count One (ADA), Count Two
(Rehabilitation Act), Count Seven (MHRA), and Count Eight (retaliation under the ADA, the
Civil Rights Act of 1964, as amended, and the MHRA) — all against the District alone.

Chappell is not actually asserting any claims under the 1964 Civil Rights Act, however.
(continued...)

summary judgment. For the reasons described below, the Court grants the motion with respect to all of Chappell's claims under the MHRA and with respect to Chappell's failure-to-accommodate claims under the ADA and the Rehabilitation Act. In all other respects, though, the Court denies the motion.

## I. BACKGROUND

Chappell was employed by the District as a junior-high and high-school teacher for about seven weeks in the fall of 2005. Chappell was originally interviewed for the position in May 2005 by District superintendent Lisa Shellum and other school administrators. Chappell Dep. 86. At the interview, Chappell revealed that she had epilepsy, but she did not tell the District that she would need any kind of accommodation if she were hired. Chappell Dep. 86-87, 116.

The District hired someone else for the position, but that individual resigned shortly after the beginning of the school year. Shellum Dep. 15. The District advertised the position again. Shellum Dep. 16. Chappell contacted Shellum to inquire about the new posting, and Shellum hired Chappell over the phone. Chappell Dep. 88-90. Chappell began working for the District on October 28, 2005. Shellum Dep. 17.

Chappell was assigned to teach English, poetry, and remedial reading. Shellum Dep. 26. One of Chappell's teaching methods was to use character voices while reading to her students. Chappell Dep. 107. Twice while Chappell was reading to her students, the phone in her

---

[1](...continued)
As the Court noted in its earlier order on defendants' motions to dismiss, her references to the Civil Rights Act are merely confusing and unnecessary ways of pleading claims that she already pleaded in other counts. The Court therefore dismisses that portion of Count Eight that purports to plead a claim under the 1964 Civil Rights Act.

classroom rang, and she answered it while remaining in character voice. Chappell Dep. 107. A staff member complained to Shellum about this, and Shellum mentioned the complaint to Chappell. Chappell Dep. 110-12. Shellum told Chappell that she wasn't being reprimanded, but Shellum wanted Chappell to be aware of the complaint. Chappell Dep. 110-11.

At some point during the first couple of weeks of her employment, Chappell noticed that Sandy Melheim, the school receptionist, had a flat-screen computer monitor. Chappell Dep. 127; Melheim Aff. ¶ 1. Chappell asked Melheim whether there were any other flat-screen monitors available. Chappell Dep. 127. Melheim said no. Chappell Dep. 127. Chappell then asked if she could be put on a waiting list for a flat-screen monitor. Chappell Dep. 127. In the meantime, Chappell brought in a filter to put over her computer screen, apparently to reduce glare and eye strain. Chappell Dep. 127-28. There is no evidence that Chappell told the District that her request for a flat-screen monitor was related to her epilepsy.

In about mid-November, Chappell had a dispute with Shellum over reimbursement for Chappell's attendance at a conference in Minneapolis. Chappell stayed in her hometown during the conference and sought reimbursement for mileage for driving from Butterfield to her hometown, as well as for driving to and from the conference. Shellum Dep. 40; Shellum Aff. Ex. C. Shellum told Chappell that Chappell would be reimbursed only for mileage between Butterfield and Minneapolis. Shellum Dep. 40-41. Chappell remarked to Shellum that the two were not getting along because they were too much alike. Shellum Dep. 41. Chappell also said that Shellum had "messed up her contract." Shellum Dep. 41.

The District's school day lasted from 8:30 a.m. to 3:05 p.m., with a half-hour break for lunch. Shellum Dep. 26. During the first trimester, Chappell's preparation period (during which

she had no class) was scheduled immediately after lunch; thus, Chappell had a midday break that stretched from the beginning of lunch (12:07 p.m.) to the end of the fourth period (1:52 p.m.). Shellum Dep. 26. On Wednesday, November 30, Chappell received the schedule for the next trimester, which was to start on the following Monday, December 5. Chappell Dep. 112-13. Chappell's preparation period during the new trimester was scheduled for the fifth period (1:55 p.m. to 3:05 p.m.). Shellum Dep. 27.

Chappell complained to Shellum about the new schedule on Friday, December 2. Chappell Dep. 113. Chappell explained that she had epilepsy and congenital fusion of two vertebrae (C2 and C3) in her neck. Chappell Dep. 116-17. Chappell asked for an opportunity to discuss her condition at a staff meeting, and Chappell informed Shellum of her need for various accommodations. In particular, Chappell explained that she needed a rest break in the middle of the day so that she would be less prone to seizures. Chappell Dep. 118-19. Chappell also explained that she had brought in a special ergonomic chair to relieve pressure on her neck, as well as a filter for her computer screen to reduce eye strain (which, in turn, helps to prevent seizures). Chappell Dep. 118. Chappell also mentioned that she could not do any heavy lifting because of her neck and that she could not chaperone school dances because strobe lights or a disco ball could trigger seizures. Chappell Dep. 120-23. Finally, Chappell requested that the schedule be changed back to the way it had been during the first trimester so that Chappell would enjoy an extra-long break in the middle of the day. Chappell Dep. 134.

There is no evidence that Chappell had asked for any accommodation of her alleged disabilities prior to this December 2 meeting with Shellum. According to Chappell, at the conclusion of the meeting, Shellum asked Chappell to provide a note from her doctor, inquired

about Chappell's medication, and said that Shellum wanted to speak with Chappell's doctor and the school nurse. Chappell Dep. 128-29. Chappell left the meeting under the impression that Shellum would make the scheduling change if Chappell provided a doctor's note. Chappell Dep. 134.

A few days later, on Tuesday, December 6, Chappell left the school building around 12:30 p.m. and did not return until 6:30 p.m. Chappell Dep. 159. Chappell did not ask permission to leave, but informed Sandy Melheim, the school receptionist, that she was leaving because her computer wasn't working properly. Chappell Dep. 159-60; Chappell Aff. ¶ 28, Aug. 1, 2009 [hereinafter "First Chappell Aff."]. The next day (Wednesday, December 7), Shellum sent Chappell an e-mail stating, in relevant part:

> I am very confused as to why you left yesterday. . . .
>
> I have no problem with you checking out and leaving to work on your computer at home, but . . . I am not pleased that you did not speak to me about your situation until you said it in passing this morning.
>
> As protocol I would like to be informed of your plans via e-mail or voice if possible and they need to be pre-approved. Sandy and Kathy do not count in the approval process. The prep time is yours, but not to leave an[d] go home to stay, as you owe the district time after school and your work day is 8 hours. . . .
>
> If a teacher needs to leave the building, a request is filled out in advance or it is pre-approved during the day by either Vonda or myself in an emergency or other situation.
>
> I realize that you returned to supervise, but you also missed your contractual after-school time owed the district.[2]

---

[2]From the length and timing of Chappell's absence, it would seem that Chappell skipped her fourth-hour class. *See* Shellum Dep. 27 (describing Chappell's second-trimester schedule).

(continued...)

Shellum Aff. Ex. E. The District also asked Chappell to complete a form for sick leave to cover her absence. Morris Aff. Ex. J.

In response, Chappell sent Shellum an e-mail complaining that she was being subjected to discrimination on the basis of disability: "Since informing my employer of my disability and requesting time to discuss the disability with other staff on 12-2 and identifying the scheduling conflict that may interfere and require reasonable accommodation[] for my disability, daily issues have escalated . . . . At this point, I feel as though I am being harassed on the basis of disability by my employer . . . ." Shellum Aff. Ex. E.

The next day (Thursday, December 8), Shellum told Chappell that there would be a meeting after school with some of the school-board members and that it would be in Chappell's best interest to attend. Chappell Dep. 167, 169. At the meeting, Shellum asked Chappell to resign. Chappell Dep. 171. Chappell asked why but did not get any response. Chappell Dep. 173-74. After Chappell declined to resign, she was told that she was being placed on paid leave, effective immediately. Shellum Aff. Ex. F. In a followup letter, the District explained that Chappell was placed on paid leave "so that district could finish its investigations into allegations that you made and . . . continue to review with school legal council [sic] documentation as kept by administration on your actions since your first day of employment 10/28/05." Shellum Aff. Ex. F. Chappell was also asked to turn in her keys and clean out her room. Shellum Aff. Ex. F; Chappell Dep. 174.

---

[2](...continued)
But Shellum's e-mail does not refer to missed class time, and the District has never claimed that Chappell skipped a class. The Court can only assume that, for some reason, Chappell's fourth-hour class did not meet on the afternoon of December 6.

For the next week or so, Chappell was in contact with representatives from Education Minnesota, the teachers' union. Chappell discussed her situation with Sherri Gustafson, the co-president of the union's local affiliate, and Mike Katzenmeyer, a union field representative. Gustafson Aff. ¶¶ 1-2; Katzenmeyer Aff. ¶¶ 1-2. Chappell asked about grieving her suspension, but was told that the union did not consider her suspension to be disciplinary because it was being served pending an investigation by the District. Shellum Aff. Ex. Y.

On Tuesday, December 13 — less than one week after Chappell was suspended — Katzenmeyer informed Chappell that Shellum wanted Chappell to submit a resignation letter by the close of business on Friday, December 16. Shellum Aff. Ex. Y. In return, the District offered to pay Chappell's salary and insurance benefits through the end of December. Shellum Aff. Ex. Y. If Chappell failed to resign, the school board would likely vote to terminate her at its meeting the following Monday, December 19. Shellum Aff. Ex. Y; Katzenmeyer Aff. Ex. A. In a series of e-mails over the next few days, Katzenmeyer also informed Chappell that she was entitled to a hearing in front of the school board, but she was not entitled to copies of the documents on which the District intended to rely in seeking her termination. Katzenmeyer Aff. Ex. A.

Chappell met with Shellum and some members of the school board on Friday, December 16. First Chappell Aff. ¶ 34. Chappell offered to resign, but asked that the Minnesota Board of Teaching (which has authority to suspend or revoke teaching licenses) not be notified of her suspension.[3] Chappell also stated that she intended to file a charge against the District with

_____

[3]Shellum testified that Chappell asked that the Board of Teaching not be notified of her suspension; Chappell asserts that, at the meeting, a board member told her that the District would
(continued...)

the EEOC.  Shellum Dep. 150; First Chappell Aff. ¶ 34.  As a result of this conversation — and, in particular, as a result of Chappell's threat to take legal action — the District decided to seek a release of claims from Chappell.  Later in the day on December 16, Shellum sent Chappell a letter stating as follows:

> This letter is being written to inform you of the terms of your resignation to the Butterfield-Odin Public School.
>
> The district agrees to pay you the remainder due and payable for the month of December 2005.  There will be no more salary payments made to you after December of 2005.
>
> The district will honor all fringe benefits given to you within the parameters of your contract for the month of December 2005.  There will be no more fringe benefits available to you after December 2005.
>
> All of this information will be included in a release of claims that will be prepared by Kevin Rupp, School District Attorney.  This document will be available for you to sign on Monday, December 19, 2005.  This Release of Claims is a document that will release the Butterfield-Odin Public School district of any and all claims or lawsuits that may have been brought forth by you.
>
> In return the district will not report you to the Board of Teaching in the state of Minnesota regarding the revocation of your teaching license.
>
> If you have any questions regarding this letter, please contact Mike Katzenmeyer.

Shellum Aff. Ex. G.

---

[3](...continued)
try to get her teaching license revoked unless she signed a release.  Shellum Dep. 150; First Chappell Aff. ¶ 34.  It is unclear who first brought up the issue of a possible report to the Board of Teaching.

Chappell first received a copy of a proposed "Separation Agreement" and "Mutual Release of All Claims" ("Release")[4] on the afternoon of Monday, December 19 — just a few hours before the school board was scheduled to meet to consider her termination. Shellum Aff. Ex. H (e-mail to Chappell with documents attached); Chappell Dep. 235, 237. Throughout the day on December 19, Chappell was in contact with Christina Clark, a lawyer for Education Minnesota whose duties included advising union members about their legal rights concerning employment issues.[5] Clark Aff. ¶¶ 1-2 & Ex. C. Before getting a copy of the Release, Chappell asked Clark whether Chappell should request that the District make the release of claims mutual — that is, whether Chappell should ask that the District also release any claims that it might have against her. Clark responded that she thought the District would be unlikely to agree to such a request. Clark Aff. Ex. C.

According to Shellum, Chappell then verbally requested that the Release be mutual. Shellum Dep. 156. Although Chappell admits asking Clark, the union attorney, about the mutuality of the Release, she denies directly negotiating for a mutual release of claims with the District. Chappell Dep. 187-88. At her deposition, though, Chappell admitted that she did not think that the initial draft of the Release contained a mutual release of claims, Chappell Dep. 188,

---

[4]Although the Separation Agreement and the Release are separate documents, the Separation Agreement incorporates the Release, and the parties have treated them as a single agreement. Shellum Aff. Ex. M ¶ 5. The Court will do likewise.

[5]Clark avers that she was in contact with Chappell as early as December 13, Clark Aff. ¶ 2, and it appears that Katzenmeyer copied Clark on a December 13 e-mail to Chappell. Chappell, however, testified that her first contact with Clark was on December 19, Chappell Dep. 190, and the record contains no e-mails between Clark and Chappell dated earlier than December 19. Obviously, for purposes of the District's motion, the Court must take Chappell's testimony as true.

195, and Chappell has not suggested any reason why the District, on its own initiative, would voluntarily give up its claims against her. For purposes of the District's motion, however, the Court must treat Chappell's testimony as true, even though her testimony is difficult to believe on this point.

In any event, Chappell signed the Release on December 19. *See* Shellum Aff. Exs. M, N. Under the Release, the District agreed that, after Chappell's right to rescind the Release expired, the District would pay Chappell an additional $1,313.22 over and above her earned wages.[6] Shellum Aff. Ex. M ¶ 3. The District also agreed to continue to provide health and other fringe benefits to Chappell through December 31. Shellum Aff. Ex. M ¶ 4. Finally, the District agreed that it would not file a complaint against Chappell with the Minnesota Board of Teaching. Shellum Aff. Ex. M ¶ 6.

For her part, Chappell agreed to release the District and all of its current and former employees from any and all claims, whether known or unknown. Shellum Aff. Ex. N § I. The Release also stated that Chappell had been informed of her right under Minn. Stat. § 363.031 to rescind the Release within fifteen days of signing it.[7]

---

[6]Although the Release states that Chappell would receive an additional $1,313.22, the District decided to give Chappell the benefit of a pay increase that was approved the same day. Second Shellum Aff. ¶ 7. Chappell's additional payment was thus $1,507.62. Second Shellum Aff. Ex. D.

[7]Minn. Stat. § 363.031 was renumbered Minn. Stat. § 363A.31 in 2003. This statute applies only to claims under the MHRA. *See* Minn. Stat. § 363A.31, subd. 2 (referring to a "waiver or release of rights or remedies secured by this chapter"); *Spitzmueller v. Burlington N. R.R..*, 740 F. Supp. 671, 679 (D. Minn. 1990) ("The statutory language clearly applies only to claims arising under "this Chapter"— that is, the Minnesota Human Rights Act."). The Release also states, however, that if Chappell exercises her right to rescind, the Separation Agreement (which includes the Release, *see* Shellum Aff. Ex. M ¶ 5) will be "null, void and of no effect."

(continued...)

-10-

Soon after signing the Release, Chappell began to have regrets. She contacted an attorney on December 25, Chappell Dep. 192, although the substance of her conversation with that attorney is not clear. Chappell also discussed the possibility of rescission with Clark, the union attorney. *See* Clark Aff. Ex. D.

Chappell never attempted to exercise her right to rescind. But in September 2006, Chappell filed a formal charge of discrimination against the District with the Minnesota Department of Human Rights ("MDHR"). Docket No. 30-1 at 8-9. In November 2007, the MDHR notified the parties that it was dismissing Chappell's charge. Shellum Aff. Ex. Q. By letter dated February 1, 2008, the MDHR denied Chappell's request that it reopen her case. Shellum Aff. Ex. R. Chappell filed her complaint in this case on March 24, 2008. As noted, her remaining claims against the District include discrimination, retaliation, and failure to accommodate under the ADA, the Rehabilitation Act, and the MHRA.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing

---

[7](...continued)
Shellum Aff. Ex. N § I. Thus, while the reference to § 363.031 suggests that Chappell only had the right to rescind her release of MHRA claims, the remaining language indicates that rescission would have voided the entire contract, including Chappell's release of non-MHRA claims. This appears to be the way the parties understand the contract, as neither side has suggested that Chappell's right to rescind was limited to her MHRA claims.

substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. The Release

The District first argues that all of Chappell's claims are barred by the Release. Chappell counters by arguing that the Release is invalid. It is not clear whether the validity of a release of federal claims is governed by federal law or by state law. *Cf. Harris v. Brownlee*, 477 F.3d 1043, 1047 n.2 (8th Cir. 2007) ("This Court has never determined whether federal or state law governs the enforcement of Title VII settlement agreements.") Nor is it clear whether there is any difference between federal law and Minnesota law regarding the validity of a release. The parties have not briefed either issue.

The parties generally agree that the Release is valid if Chappell knowingly and voluntarily entered into it. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974); *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) (citing *Alexander*). Chappell has canvassed a number of federal and Minnesota cases and asserted that the validity of the Release turns on the following factors: (1) whether the Release was supported by adequate consideration; (2) whether Chappell had access to counsel; (3) the clarity of the Release; (4) the length of time Chappell had to consider the Release; (5) whether Chappell was able to negotiate any changes to the Release; (6) the presence or absence of fraud, duress, or other inequitable

conduct.  *See Ulvin v. Nw. Nat'l Life Ins. Co.*, 943 F.2d 862, 867 (8th Cir. 1991); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 541 (8th Cir. 1987); *Karnes v. Quality Pork Processors*, 532 N.W.2d 560, 562 (Minn. 1995).  At oral argument, the District agreed that the factors identified by Chappell — with one exception (discussed below) — should be applied in determining whether the Release is valid.

Applying those factors, the Court finds that whether Chappell voluntarily entered into the Release is a genuine issue of material fact.  Chappell was asked to resign, and then suspended, almost immediately after Chappell complained to Shellum of discrimination.  Chappell accused Shellum of discrimination on December 7, and Shellum asked Chappell to resign — and then suspended her when she refused — on December 8.  In fact, the record demonstrates that Chappell was suspended *because* of her complaint of discrimination.  Specifically, the District told Chappell that it was suspending her in order to investigate her complaint.  Needless to say, it is unusual for an employer who receives a complaint that an employee has been victimized by unlawful conduct to suspend the alleged *victim* during an investigation; typically, if anyone is suspended, it is the alleged *perpetrator*.

A few days later, the District told Chappell that, if she signed a release, the District would not ask the Minnesota Board of Teaching to revoke her teaching license.  This was a highly coercive and highly improper threat.  If the District was aware of some reason why Chappell was unfit to teach, then it should have reported that reason to the Board of Teaching — period.  Instead, the District put children at risk in order to save itself the cost of defending a lawsuit.  If the District was not aware of some reason why Chappell was unfit to teach — and the District has never identified any such reason — then it simply bullied Chappell by threatening to put her

-13-

livelihood at risk for no justifiable reason. The coercive effect of the District's bullying was amplified by the fact that Chappell's attempts to obtain information about the reasons for her imminent termination were rebuffed. Under these circumstances, a reasonable jury could find that Chappell was coerced into signing the Release. *See Bond v. Charlson*, 374 N.W.2d 423, 428 (Minn. 1985) (duress is available as a defense to a contract "when agreement is coerced by physical force or unlawful threats").

The District also pressured Chappell into signing the Release by giving her essentially no time to consider it. Chappell first heard of the Release on Friday, December 16, and was told that she had to sign it by Monday, December 19. Chappell did not receive a copy of the Release until just a few hours before the deadline. Although Chappell had access to counsel from the union, the District's demands effectively deprived her of the ability to consult with outside counsel of her choice — or to consult with any attorney, whether of her choice or not, for a meaningful length of time. It is true, as the District points out, that this time pressure was mitigated somewhat by the fact that Chappell had fifteen days to rescind the Release. Nevertheless, the fact remains that Chappell signed the Release after being given almost no time to consider it or to consult with counsel.

Moreover, the statement in the Release concerning Chappell's rescission rights under the MHRA is somewhat confusing. In particular, the Release did not make clear whether Chappell had the right to rescind only the release of her MHRA claims or instead the right to rescind the release of all of her claims. A lawyer could discern that Chappell's rescission of the release of her MHRA claims would also serve to rescind the release of her non-MHRA claims, but that reading would not be obvious to a non-lawyer.

The District points to evidence that Chappell negotiated changes to the Release and that, in general, Chappell is a sophisticated person who has previously been involved in litigation and settled claims. If this evidence in fact exists, it will certainly help the District as it seeks to establish the validity of the Release. At this point, though, the evidence surrounding Chappell's negotiation of changes to the Release is murky. And even if the evidence were clear, it would not entitle the District to summary judgment in light of the countervailing evidence that Chappell signed the Release under duress.

Chappell also argues that she received no consideration, or at least inadequate consideration, for the Release. As noted above, the District generally agrees with Chappell about the factors that should be considered in deciding whether the Release is valid. This is the one exception: The District contends that the *adequacy* of the consideration, as opposed to the *existence* of consideration, is not a proper factor to consider.

Whether the Court is supposed to weigh the adequacy of the consideration is not clear. Minnesota courts have said that "adequacy of consideration" is a factor to be considered in determining the validity of a release. *Karnes*, 532 N.W.2d at 562 (quoting *Schmidt v. Smith*, 216 N.W.2d 669, 673 (Minn. 1974). But there is also language in Minnesota cases suggesting that ordinary contract principles apply in determining the validity of releases and settlement agreements. *Id.* (stating that releases are governed by the rules of contract construction and, like any contract, require consideration, voluntariness, and contractual capacity). Under ordinary contract principles, courts "do *not* examine the adequacy of consideration as long as something of value has passed between the parties." *Kielley v. Kielley*, 674 N.W.2d 770, 777 (Minn. Ct. App. 2004) (emphasis added).

The Eighth Circuit has likewise been unclear. On the one hand, the Eighth Circuit has applied ordinary contract principles in determining whether a release is valid. *See Lancaster*, 809 F.2d at 541. As noted, a court applying ordinary contract principles generally does not examine the adequacy of consideration. On the other hand, the Eighth Circuit has stated that the adequacy of consideration is a factor to be considered in determining whether a release was knowing and voluntary. *Woods v. Rhodes*, 994 F.2d 494, 502 (8th Cir. 1993). Further muddying the waters is the fact that courts sometimes use the phrase "adequacy of consideration" as a shorthand way of referring to the *existence* of consideration — a very different matter. *See, e.g., Kielley*, 674 N.W.2d at 777. Everyone agrees that a court may determine whether consideration *exists*.

The Court need not decide whether, in determining the validity of the Release, the Court may take into account the adequacy of the consideration received by Chappell. Even if this factor is ignored, Chappell has succeeded in raising an issue of fact concerning the validity of the Release. That said, the Court is inclined to believe that the adequacy of consideration is evidence — not *conclusive* evidence, but nonetheless *relevant* evidence — about whether a party acted knowingly and voluntarily in signing a release. When there is a large gap between the value of the consideration received and the value of the claims released — when, for example, the releaser receives a peppercorn in return for giving up a can't-miss claim worth over $1 million — then it is more likely that the releaser did not act knowingly and voluntarily in signing the release. In this case, there appears to be a gap between the value of the consideration received by Chappell — approximately $1500 in pay and less than two weeks of benefits — and the value of the strong retaliation claim that she gave up. That gap tends to support Chappell's claim that she did not act voluntarily in signing the Release.

Finally, Chappell argues that the Release is entirely void because it is contrary to public policy for a school district to promise not to report a teacher to the Board of Teaching. *See Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d 354, 356 (Minn. Ct. App. 1995) ("A contract violating law or public policy is void."). The District does not seriously dispute that, if there were any reason to report Chappell to the Board of Teaching, it would be against public policy to enforce the District's promise not to make such a report.

The fact that the Release includes a promise from the District that violates public policy does not render the entire Release invalid, though. As the District points out, the Release contains a severability clause which provides as follows:

> In case any one or more of the provisions of this Separation Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Separation Agreement will not in any way be affected or impaired.

Shellum Aff. Ex. M ¶ 9.[8] This severability clause unambiguously expresses the parties' intent that the invalidity of any provision of the contract will not affect the validity of the remaining provisions. The Court therefore holds that the District's invalid promise not to report Chappell to the Board of Teaching is severable and does not void the remainder of the Release.

Chappell argues that, even if the invalidity of the District's promise does not automatically invalidate the entire Release, it nevertheless renders the Release unenforceable for lack of consideration. According to Chappell, she received nothing of value in return for her agreement to release her claims *except* the promise not to report her to the Board of Teaching. If

---

[8]Both the District's promise not to report Chappell and the severability clause appear in the Separation Agreement. As noted earlier, however, the Separation Agreement incorporates the Release, and the parties treat the two documents as a single agreement.

-17-

that promise was not enforceable, then she received nothing for the Release, and if she received nothing for the Release, then the Release was not supported by consideration.

Chappell's argument is premised on her assertion that the money that she was paid in exchange for the Release represented wages to which she was already entitled. An examination of the record, however, demonstrates that Chappell is incorrect. Chappell's salary for the 2005-2006 school year was $23,355.32. First Chappell Aff. Ex. A. Pursuant to Chappell's employment contract, the District was authorized to determine the appropriate payment installments during the year. First Chappell Aff. Ex. A ("Such salary shall be paid as authorized and in such installments during the term of the year as may be determined by appropriate school board regulation."). The District pays its employees in equal monthly installments. Second Shellum Aff. ¶ 3. Chappell started work at the end of October, when there were ten months left in the school year (November 2005 through August 2006). Second Shellum Aff. ¶ 3. Accordingly, Chappell's monthly salary was $2,335.53. Second Shellum Aff. ¶ 3. Although Chappell worked less than two full months, the District paid her a total of $6,178.68, which is $1,507.62 *more* than two months' pay ($4,671.06). Second Shellum Aff. Ex. D.

Chappell contends that her pay should be calculated by an effective daily rate of $166.23, which represents her yearly salary divided by the total number of teaching days in the year (140.5). But, as noted, the District had the contractual right to pay Chappell in equal monthly installments. Moreover, even if Chappell is correct, the resulting figure for 36 days of work is $5,984.28, which is still less than what Chappell ultimately received.[9] Chappell argues that the

_____

[9]Chappell does not dispute the District's assertion that she was employed for a total of 36 teaching days. Second Shellum Aff. ¶ 6.

-18-

difference between the $6,178.68 that she received and the $5,984.28 to which she would be entitled under her theory is due to a raise approved on December 19, the day of her resignation. It is far from clear, however, that Chappell was entitled to the benefit of that raise. The Release unequivocally states the amount of money that Chappell had agreed to accept in return for releasing her claims, and that amount was calculated without the benefit of the raise. At best, Chappell had only a contested right to the raise, and where an employee has only a contested right to a payment, the payment can constitute consideration. *Warnebold v. Union Pac. R.R.*, 963 F.2d 222, 223-24 (8th Cir. 1992).

Finally, setting aside all of Chappell's arguments regarding the direct monetary consideration that she received, there is no dispute that she received fringe benefits through December 31, 2005 to which she was not otherwise entitled. Moreover, there is no dispute that the District agreed to release any claims that it may have had against Chappell. Without question, then, the Release is supported by consideration other than the District's promise not to report Chappell to the Board of Teaching. As a result, the invalidity of the District's promise does not render the Release void for lack of consideration.

### C. Equitable Tolling

The District moves for summary judgment on Chappell's MHRA claims on the basis that they are untimely. Chappell was required to "bring" her MHRA action "within 45 days after receipt of notice that the commissioner . . . has decided not to reopen a dismissed case that the charging party has asked to be reopened . . . ." Minn. Stat. § 363A.33, subd. 1(2). An action is not "brought" for purposes of the MHRA until it is "commenced" for purposes of Rule 3.01 of the Minnesota Rules of Civil Procedure, and an action is not "commenced" for purposes of

Rule 3.01 until the complaint is both filed and served. Chappell *filed* her complaint on the last day of the 45-day period, but her complaint was not *served* until several weeks later. Thus, Chappell did not "bring" her MHRA claims within the 45-day period provided by Minn. Stat. § 363A.33, subd. 1(2). *See Ochs v. Streater, Inc.*, 568 N.W.2d 858, 859-60 (Minn. Ct. App. 1997) (plaintiff's MHRA claims were time-barred because, although he filed his complaint within the 45-day period, he failed to serve the defendant within the 45-day period).

Chappell argues, though, that the statute of limitations should be equitably tolled. The 45-day period in § 363A.33 is subject to equitable tolling. *Ochs*, 568 N.W.2d at 860. In considering whether to apply equitable tolling, courts consider whether circumstances beyond the plaintiff's control prevented her from serving the complaint within the statutory period. *Id.* Courts also consider whether there is any prejudice to the defendant, although a lack of prejudice does not mean that the limitations period must be tolled. *Id.* "Equitable tolling 'is an exception to the rule, and should therefore be used only in exceptional circumstances.'" *Anderson v. H-Window Co.*, No. C9-98-1103, 1999 WL 88953, at *4 (Minn. Ct. App. Feb. 23,1999) (quoting *Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323, 1330 (8th Cir. 1995)). Chappell bears the burden of establishing that the limitations period should be tolled. *Bartlett v. Miller & Schroeder Muns., Inc.*, 355 N.W.2d 435, 441 (Minn. Ct. App. 1984).

Chappell contends that the limitations period should be equitably tolled because she filed both the complaint and a motion to proceed *in forma pauperis* ("IFP") within the 45-day period. *See* Docket Nos. 1, 2. When a plaintiff is authorized to proceed IFP, the Court must order that service be made by a United States marshal or other person specially appointed by the Court. Fed. R. Civ. P. 4(c)(3). Because she filed a motion to proceed IFP, Chappell argues, the timing

of service was outside of her control and should not be counted against her. Moreover, Chappell points out that her complaint was not served until 42 days after she filed it; without equitable tolling, Chappell argues, it would be almost impossible for any plaintiff who needs to proceed IFP to bring a timely MHRA action. Finally, Chappell claims that she thought that she had retained an attorney to file and serve a complaint on her behalf, but she discovered on March 17, one week before the 45-day deadline was set to expire, that the attorney would not be able to take her case. Chappell Dep. 199-201, 203.

The Court might have some sympathy for Chappell's argument had she filed her complaint and IFP motion at least a few days before the deadline. But she did not. Instead, she waited until the last day of the 45-day deadline, thus *guaranteeing* that her MHRA action would not be timely. More importantly, even taking as true Chappell's testimony that an attorney waited until March 17 — one week before the 45-day deadline was set to expire — to inform Chappell that the attorney would not take her case, an attorney's negligence does not establish "extraordinary circumstances" justifying equitable tolling. *See Johnson v. Henderson*, 234 F.3d 367, 368 (8th Cir. 2000) (per curiam) (no equitable tolling where late filing is the result of attorney's ordinary neglect). In addition, although Chappell admits that she received help from the Epilepsy Legal Defense Fund in drafting her complaint, she claims (rather unconvincingly) that she does not remember how the complaint that she filed was produced, who did most of the drafting, who typed the complaint, or even from whose computer it was printed. Chappell Dep. 203-06. Having disclaimed any memory of how her complaint was generated, Chappell cannot offer — and has not offered — any reason why she had to wait until the last possible moment to file it. Under these circumstances, Chappell has failed to carry her burden of showing

"exceptional circumstances" entitling her to the remedy of equitable tolling.  The District's

motion for summary judgment on Chappell's MHRA claims is granted.

### D.  Discrimination

The ADA forbids employers to take adverse action against employees because of

disability.[10]  42 U.S.C. § 12112(a).  The parties agree that Chappell's discrimination claim should

be analyzed under the familiar three-step framework described in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-04 (1973).  To establish a prima facie case of disability discrimination

under that framework, Chappell must show that (1) she has a disability within the meaning of the

ADA; (2) she is qualified to perform the essential functions of the job, with or without

reasonable accommodation, and (3) she suffered an adverse employment action because of her

disability.  *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009).[11]  For purposes

of its motion for summary judgment, the District does not dispute that Chappell was qualified to

perform the essential functions of her job.  Instead, the District argues that (1) Chappell is not

disabled and (2) Chappell did not suffer any adverse employment action.  The Court considers

each argument in turn.

---

[10]The ADA and the Rehabilitation Act impose similar requirements on employers.
*Shipley v. City of Univ. City*, 195 F.3d 1020, 1022 (8th Cir. 1999) ("The same basic standards
and definitions are used under both the ADA and the Rehabilitation Act so cases interpreting
either may be relevant to the other.").  The Court will therefore treat Chappell's ADA and
Rehabilitation Act claims as one and the same.

[11]Employment-discrimination claims need not be analyzed under the *McDonnell Douglas*
burden-shifting framework when the plaintiff presents strong or "direct" evidence of
discrimination.  *See Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1039-42
(D. Minn. 2008).  As discussed below, Chappell has offered what could be considered direct
evidence of discrimination.  The parties nevertheless apply the *McDonnell-Douglas* test, so the
Court will do likewise.

1. Disability

An employee is considered disabled under the ADA if one of three things is true: (1) she is actually disabled — that is, she has a physical or mental impairment that substantially limits a major life activity; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment. 42 U.S.C. § 12102(1). Chappell argues that she is disabled under all three definitions. As explained below, Chappell has failed to raise a genuine issue of fact concerning whether she is actually disabled or has a record of disability, but there is a genuine issue of fact concerning whether the District regarded Chappell as disabled.

*a. Actually Disabled*

There is no dispute that Chappell's epilepsy and C2-C3 fusion are physical impairments. Having examined the record, however, the Court concludes that Chappell has failed to raise a genuine issue of fact concerning whether these impairments substantially limit any of her major life activities.

Chappell first had a seizure in 1983, when she was a teenager. Chappell Dep. 34. Since then, Chappell's seizures have been infrequent. Her medical history indicates that she had one seizure in 1993, one seizure in 1997, one seizure in 1998, and one seizure in January 2000. Jacoby Aff. Ex. B, Ex. L. A November 2003 chart note states that Chappell's seizure disorder was "stable" and that Chappell had not had a seizure "for many years." Jacoby Aff. Ex. K. Chappell testified that she had a seizure in early October 2005, but could not say whether she had any other seizures that year and could not remember whether she had any seizures in 2003 or 2004. Chappell Dep. 34-35. Chappell did not have a seizure while she was employed by the District. Chappell Dep. 26. After her discharge from the District, Chappell had seizures in

March and April of 2006 and December of 2007.  Chappell Dep. 26-27, 33.

In December 2005 — while Chappell was still employed by the District — her neurologist, Robert Jacoby, authored a letter stating that Chappell was restricted from lifting, repetitive movement, and twisting.  Jacoby also opined that Chappell needs a "longer" break to be able to stretch and relax her neck and that she should avoid bright light, use a flat-screen monitor, and have an ergonomic work station that supports her back and neck.  First Chappell Aff. Ex. G.

The term "substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  Chappell contends that her impairments substantially limit her ability to lift, stand, sit, and work.  Chappell also argues that, while she is having a seizure, her ability to walk, stand, speak, see, think, control her movements, perform manual tasks, and care for herself are all substantially limited.

In determining whether epilepsy substantially limits an individual's major life activities, courts examine not just the severity of the individual's seizures, but also the frequency.  For example, in *Otting v. J.C. Penney Co.*, the Eighth Circuit found that the plaintiff was disabled in light of evidence that she suffered severe seizures two to three times per month, was prohibited from driving, and could not take baths by herself because of the risk of drowning.  223 F.3d 704,

709-11 (8th Cir. 2000). *Otting* distinguished *Moreno v. American Ingredients Co.*, in which the court held that a plaintiff who suffered a seizure approximately once every month or two was not disabled. No. 99-2119, 2000 WL 527808, at *3 (D. Kan. Apr. 7, 2000). Likewise, in *Brunke v. Goodyear Tire & Rubber Co.*, the Eighth Circuit held that the plaintiff was not disabled because he suffered two seizures over the course of two years and no more thereafter. 344 F.3d 819, 820-21 (8th Cir. 2003).

Here, the evidence demonstrates that Chappell was affected far less by her epilepsy than the disabled plaintiff in *Otting* or the non-disabled plaintiffs in *Moreno* and *Brunke*. In the five years preceding Chappell's employment with the District, she suffered only one seizure. Despite that seizure (which occurred in October 2005), Chappell maintained a driver's license and (on at least at couple of occasions) drove long distances while she was employed by the District. Shellum Aff. ¶ 18 & Ex. L. In the four years since being fired, Chappell has had three seizures. Under these circumstances, Chappell's epilepsy does not substantially limit her ability to walk, stand, speak, see, think, control her movements, perform manual tasks, or care for herself. *See E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) ("To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds.").[12]

---

[12]Chappell states in her affidavit that her seizures are "chronic intractable, meaning they are recurring and cannot be controlled with medication." First Chappell Aff. ¶ 16. But Chappell's medical records repeatedly state that her seizure condition is "*not* intractable." Jacoby Aff. Exs. B, H, I (emphasis added). In addition, Chappell admitted at her deposition that she could not have maintained a driver's license unless her doctor believed that her seizures were adequately controlled with medication. Chappell Dep. 182. Chappell cannot avoid summary judgment by submitting an affidavit that contradicts her deposition testimony. *Harry Stephens Farms, Inc. v. Wormald Ams., Inc.*, 571 F.3d 820, 821 (8th Cir. 2009) (party cannot raise issue of
(continued...)

Chappell argues that the precautions she takes to limit her risk of suffering a seizure are themselves substantially limiting. It is true that Chappell's doctor has restricted her from lifting, but the Eighth Circuit has held that a restriction on lifting alone is not a substantial limitation. *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 783 (8th Cir. 2006). Rather, a plaintiff must show that the restriction on lifting, together with limitations on other basic motor functions, "prevent or severely restrict the plaintiff from doing the set of manual tasks that are of central importance to most people's daily lives." *Id.* (citation and quotations omitted). In addition to her limitation on lifting, Chappell is restricted from engaging in repetitive movement or twisting and must avoid bright lights and rest her neck for some period of time each day. But Chappell has not shown that these limitations have any effect on her ability to engage in any major life activities.

Finally, Chappell argues that she is limited in the major life activity of working because state law renders her ineligible to obtain a commercial driver's license and mandates an automatic six-month suspension of her non-commercial driver's license after a seizure. Chappell's assertion that a seizure mandates an automatic six-month suspension of her driver's license is not correct; Minn. R. 7410.2500, subpart 3, sets out certain exceptions under which a seizure will *not* trigger suspension, and Chappell in fact retained her driver's license while she

---

[12](...continued)
fact simply by submitting affidavit contradicting his own earlier testimony); Chappell Dep. 181 (Chappell currently has a driver's license); Shellum Aff. Ex. L (copy of Chappell's license issued July 2005).

Chappell also testified that she currently receives Social Security disability income. Chappell Dep. 29. Given that Chappell's medical history unambiguously establishes that she was not actually disabled during the time relevant to this action, the fact that she is now considered disabled by the Social Security Administration is not relevant.

was employed by the District despite her October 2005 seizure. Although Chappell's license was suspended for some period of time after she was fired by the District, Chappell has not offered evidence that she has been without a driver's license as a result of her epilepsy for a substantial period of time during her adult life.

It is true that Chappell is precluded from obtaining a *commercial* driver's license, but that is not a substantial limitation on the major life activity of working. *Rigby v. Springs Indus. Inc.*, 156 Fed. Appx. 130, 131 (11th Cir. 2005) (per curiam); *Russo v. Sysco Food Servs. of Albany, L.L.C.*, 488 F. Supp. 2d 228, 233-34 (N.D.N.Y. 2007); *cf. Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523-24 (1999) (employer's belief that plaintiff was unable to obtain a Department of Transportation health certification, which is necessary to drive commercial vehicles in interstate transportation, did not render plaintiff "regarded as" disabled). Moreover, to be substantially limited in the major life activity of working, Chappell must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes *as compared to the average person having comparable training, skills and abilities*." 29 C.F.R. § 1630.2(j)(3) (emphasis added); *cf. Murphy*, 527 U.S. at 524-25 (noting that, in light of the plaintiff's skills as a mechanic and the array of jobs available to him, his employer's belief that he could not obtain a DOT certification did not mean he was regarded as substantially limited in the major life activity of working). Chappell is a teacher. There is no evidence that she has any training or skill as a commercial driver, nor is there any evidence that there are any teaching jobs (or any other jobs for which she is suited) that require a commercial driver's license. *Murphy*, 527 U.S. at 524 ("At most, petitioner has shown that he is regarded as unable to perform the job of mechanic only when that job requires driving a commercial motor

vehicle — a specific type of vehicle used on a highway in interstate commerce."); Minn. Stat. § 171.01, subd. 22 (defining "commercial motor vehicle" as (1) a vehicle weighing more than 26,000 pounds; (2) a bus; or (3) a vehicle used in the transportation of hazardous materials). Chappell's inability to obtain a commercial driver's license thus does not render her disabled within the meaning of the ADA.

### b. Record of Disability

Chappell next argues that, because she has a record of impairments (epilepsy and C2-C3 fusion), she is disabled. But it is not enough to have a record of an impairment; instead, a plaintiff must have "a history of, or . . . been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Nothing in Chappell's medical history demonstrates that her impairments substantially limit any major life activities. To the contrary, her medical records repeatedly state that her seizures are under control. Jacoby Aff. Ex. B (January 2000 chart note stating that "Stephanie has remained very stable when her doses are correct"); *id.* Ex. D (November 2001 chart note stating "she has not had any seizures at this time"); *id.* Ex. J (August 2003 chart note stating that Chappell "has had no seizures" and "seems to be stable and not having any seizures" during a changeover in medication); *id.* Ex. K (November 2003 chart note stating "[i]n regard to her seizure disorder, that has remained stable. I do not see any reason why she cannot drive based on the fact she has not had a seizure for many years and is on appropriate medication."); *id.* Ex. L (April 2005 chart note stating that Chappell had a seizure in 1997, a seizure in 1998, and a seizure in 2000, but "[o]therwise, she has been doing fairly well"). Chappell has failed to raise a genuine issue of fact regarding her claim that she has a record of disability.

*c. Regarded as Disabled*

Finally, Chappell argues that the District regarded her as disabled. Chappell points to

Shellum's deposition, in which Shellum described her reaction to Chappell's description of her

epilepsy at their December 2 meeting as follows:

> As an administrator of a school I have a teacher now telling me that
> she's had seizures in a classroom, and she did not disclose where it
> was before, where in the middle of a class she had a seizure, she
> fell on the floor, she hit her head, she was bleeding, but all she
> wanted was for another teacher to come in and take her kids out of
> the room for ten minutes, and then once she was better, the kids
> could come back in the room and she would start teaching again.
> I found that shocking. I have never seen anyone in a seizure, I have
> no family — relatives that have seizures, I don't know enough
> about it, so obviously I was — I couldn't believe it, so I think that
> was my reaction towards her.

Shellum Dep. 83-84. Chappell also asserts, in her affidavit, that at the same meeting Shellum

stated that she was "not comfortable having a person with epilepsy teaching children at the

school." First Chappell Aff. ¶ 29. The Court must accept Chappell's claim as true, even though,

like several other sworn assertions she has made, it is difficult to believe.[13]

"In order to be regarded as disabled with respect to the major life activity of working, the

employer must mistakenly believe that the actual impairment substantially limits the employee's

ability to work." *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 989 (8th Cir. 2007). "If an

_____

[13]Chappell never mentioned this alleged statement at her deposition, even when Chappell
was asked to identify anything else that was discussed at the December 2 meeting that had not yet
been covered. *See* Chappell Dep. 138. Chappell's sudden recollection of this extremely
damaging statement is so difficult to believe that it skirts the border of failing to raise a genuine
issue of fact. *See Bacon v. Hennepin County Med. Ctr.*, 550 F.3d 711, 713, 716 (8th Cir. 2008)
(disregarding the plaintiff's testimony that her supervisor told her not to call in because the
plaintiff did not make that claim until two years after she was terminated). Nevertheless, mindful
of its limited role at summary judgment, the Court will credit Chappell's assertion.

employer believes that an employee is unable to perform one specific job, then the employee is not regarded as disabled." *Id.* (citation and quotations omitted). Although it is a close question, the Court believes that, in light of Shellum's deposition testimony, and in light of Chappell's assertion about the December 2 meeting, a reasonable jury could find that Shellum regarded Chappell as unable to work in the field of teaching. *See* 29 C.F.R. § 1630.2(j)(3) (substantially limited in the major life activity of working means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes"); *cf. Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 725-26 (7th Cir. 1998) (plaintiff was not disabled because she could not establish that she was incapable of performing any teaching job rather than a specific type of teaching job). The Court therefore finds that Chappell has raised an issue of fact concerning whether the District regarded her as disabled.

## 2. Adverse Action

Chappell contends that she was subject to adverse employment actions when the District (1) required her to get permission before leaving the building; (2) placed her on involuntary leave; and (3) coerced her into resigning. An adverse employment action is one that produces a "material employment disadvantage." *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007) (citation and quotations omitted). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones," do not constitute adverse employment actions. *Id.*

The Court agrees with the District that requiring Chappell to get permission before leaving the school building during working hours does not constitute a material employment disadvantage. Shellum asked Chappell to fill out a request form and send either an e-mail or a voice message to Shellum when Chappell wanted to leave the building. These are hardly onerous

conditions, particularly in light of the fact that Chappell offers no evidence that Shellum would not have granted such a request. To the contrary, Shellum's e-mail to Chappell states that Shellum had "no problem with you checking out and leaving to work on your computer at home . . . ." Shellum Aff. Ex. E. Under these circumstances, having to submit an advance request before leaving work is a minor change in working conditions.

The same cannot be said about Chappell's suspension and eventual resignation. It is true that the Eighth Circuit has previously held that an investigatory suspension with pay is not an adverse employment action. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891-92 (8th Cir. 2005). But *Singletary* emphasized that the plaintiff was promptly restored to his original position after the conclusion of the investigation. *Id.* at 891. Here, the District first asked Chappell to resign, and then, after she refused, suspended her. The reason given by the District for the suspension — that the alleged victim of unlawful behavior (as opposed to the alleged perpetrator) should be removed from the workplace during the investigation — was dubious, to say the least. Shortly after Chappell was suspended, the District threatened to seek the revocation of her teaching license — a grossly inappropriate threat, given that the District had no reason to believe that Chappell was unfit to teach. And Chappell was never restored to her original position; instead, she was forced to resign. Although Chappell never uses the phrase, the Court believes that a reasonable jury could find that Chappell was constructively discharged, and a constructive discharge is, of course, an adverse employment action. *See Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008) (circumstances amounting to a constructive discharge are an adverse employment action). In light of all of these circumstances, Chappell has raised a genuine issue of fact concerning whether she suffered an adverse employment action.

### 3. Legitimate, Nondiscriminatory Reason and Pretext

Because Chappell has established a prima facie case of employment discrimination, the District must come forward with a legitimate, nondiscriminatory reason for the adverse employment action. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008). Chappell then must show that the District's proffered reason was a pretext for discrimination. *Id.*

The District argues that it asked Chappell to resign "because of her repeatedly contentious and insubordinate behavior and her disregard for school protocol." Docket No. 114 at 29. There is ample evidence, though, that this stated reason is pretextual. Most of the circumstances to which the District now points — such as Chappell complaining that Shellum "messed up her contract" and Chappell using character voices when answering the classroom phone — are complaints about trivial incidents that occurred weeks before Chappell was suspended. There is little or no evidence that these events were deemed serious by Shellum at the time they occurred. The most serious accusation the District can muster is that Chappell left the school grounds on one occasion without permission. But Shellum did not discipline Chappell for that infraction; instead, Shellum sent Chappell a polite e-mail reminding Chappell to seek prior approval before leaving school during the day.

It was only after Chappell accused Shellum of discrimination that Shellum demanded Chappell's resignation and then suspended her. At the time, the District did not connect the suspension to any alleged misbehavior by Chappell; instead, the District claimed that it was suspending Chappell in order to investigate her complaint of discrimination. The District also told Chappell that it was suspending her in order to conduct a review of all her actions since her first day of work. In other words, the District all but admitted that, during Chappell's

suspension, it would be undertaking a fishing expedition to try to come up with a reason for terminating her.

These circumstances fairly reek of pretext. Of course, the fact that the explanation given for an adverse action is untrue does not mean that the real reason for the adverse action was discriminatory animus. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."). And, indeed, the District's best defense to the claim that it was *discriminating* against Chappell when it suspended her may be the strong evidence that the District was in fact *retaliating* against Chappell for complaining of discrimination. But the Court will leave it to the jury to determine which of these improper grounds (if either) motivated the District. The District's motion for summary judgment on Chappell's discrimination claim is denied.

### E. Reasonable Accommodation

The ADA requires employers to make reasonable accommodations to enable disabled employees to do their jobs, if the employer can do so without undue hardship. 42 U.S.C. § 12112(b)(5)(A). Chappell claims that the District is liable for failing to grant her requests for a flat-screen computer monitor, a change in her schedule, and a chance to inform other staff about what to do in the event Chappell had a seizure at work. As discussed above, however, Chappell has failed to raise a genuine issue of fact concerning whether she is actually disabled or has a record of disability. Chappell can meet the ADA's definition of disabled only if she convinces a jury that the District regarded her as disabled. A plaintiff who is not actually disabled, but who is

merely regarded as disabled, is not entitled to reasonable accommodations — for the simple

reason that an employer cannot be held liable for failing to accommodate a disability that does

not exist. *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999). The Court therefore grants

the District's motion for summary judgment on Chappell's failure-to-accommodate claim.

*F. Retaliation*

The ADA forbids an employer from discriminating against an employee because the

employee "opposed any act or practice made unlawful by [the ADA] or because [the employee]

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing" conducted pursuant to the ADA. 42 U.S.C. § 12203(a). To establish a prima facie

case of retaliation, Chappell must establish that (1) she engaged in statutorily protected activity;

(2) a materially adverse action was taken against her; and (3) a causal connection existed between

the two events. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007)

(describing prima facie case for retaliation); *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53,

67-68 (2006) (explaining that the standard for adverse action in retaliation claims under Title VII,

which contains an anti-retaliation provision that is substantively similar to the anti-retaliation

provision in the ADA, is whether a reasonable employee would have found the challenged action

materially adverse).

The District does not dispute that Chappell's December 7 complaint to Shellum — who

was not only the person accused of discrimination, but also the District's human-rights officer

responsible for fielding complaints about discrimination — was protected activity under

§ 12203(a). The Court has already found that the District took a materially adverse action against

Chappell when it suspended her and then forced her to resign. The only question is whether a

reasonable jury could find a causal connection between Chappell's complaint of discrimination and Chappell's suspension by the District.

It is true, as the District stresses, that "temporal proximity alone is generally insufficient to raise a triable issue of material fact on retaliatory motive . . . ." *Flowers v. City of Minneapolis*, 558 F.3d 794, 800 (8th Cir. 2009). But "any consideration of the impact of temporal proximity 'standing alone' tends to be unhelpful. . . . Viewed within the context of the overall record, temporal proximity may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1122 (8th Cir. 2006). In addition, "[w]here an employer tolerates an undesirable condition for an extended period of time, and then, shortly after the employee takes part in protected conduct, takes an adverse action in purported reliance on the long-standing undesirable condition, a reasonable jury can infer the adverse action is based on the protected conduct." *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 875 (8th Cir. 2008).

That is precisely the situation here. The District tolerated Chappell's allegedly contentious and insubordinate behavior for several weeks, and then, *one day* after Chappell engaged in protected conduct by complaining of discrimination, ask her to resign and suspended her when she refused. The District also gave an explanation for the suspension that will likely be found pretextual. Under these circumstances, a reasonable jury could easily "infer the adverse action is based on the protected conduct." *Id.*. The District's motion for summary judgment on the retaliation claim is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS
HEREBY ORDERED that:

1.      The motion of defendant Butterfield-Odin School District No. 836 for summary
judgment [Docket No. 112] is GRANTED IN PART AND DENIED IN PART.

      a.      The motion is GRANTED with respect to plaintiff's claims under the
Minnesota Human Rights Act, and those claims are DISMISSED WITH
PREJUDICE AND ON THE MERITS.

      b.      The motion is GRANTED with respect to plaintiff's claims for failure to
accommodate in violation of the Americans with Disabilities Act and the
Rehabilitation Act, and those claims are DISMISSED WITH PREJUDICE
AND ON THE MERITS.

      c.      The motion is DENIED in all other respects.

2.      To the extent that Count Eight purports to assert a claim under the Civil Rights
Act of 1964, as amended in 1991, Count Eight is DISMISSED WITHOUT
PREJUDICE.


Dated: November 17, 2009              s/Patrick J. Schiltz
                                      Patrick J. Schiltz
                                      United States District Judge